IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DAMIEN SMITH,

                                                  OPINION AND ORDER

                Plaintiff,

                                                 17-cv-856-bbc

        v.

THE CITY OF MADISON, CORY NELSON,
SAMANTHA KELLOGG, PAIGE VALENTA,
COLLEEN MCCOSHEN and NOBLE WRAY,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

       Plaintiff Damien Smith, who is incarcerated at the New Lisbon Correctional Institution, is proceeding on two claims: (1) defendants City of Madison, Noble Wray, Cory Nelson, Samantha Kellogg, Paige Valenta and Colleen McCoshen forced him to be a part of the "focused deterrence" program because of his race and without an opportunity to be heard, in violation of the equal protection clause and the due process clause; and (2) defendants Nelson, Kellogg and Valenta violated his rights under the Fourth Amendment by searching him and his electronics without reasonable suspicion while he was on probation from November 2011 to May 2012.

       The following motions are before the court: (1) a motion for summary judgment filed by defendants Wray, Valenta, Kellogg, Nelson and the City of Madison (the city defendants), dkt. #43; (2) defendant McCoshen's motion for summary judgment, dkt. #51; (3) McCoshen's motion to dismiss the claims against her as a sanction for plaintiff's filing third-party declarations that undermine the judicial process, dkt. #82; and (4) the city defendants' motion to strike the declaration of Romale Grant and not allow him to testify

at trial on the ground that he did not make himself available for a deposition in this case, dkt. #85. For the reasons stated, I find that no reasonable jury could find in plaintiff's favor on any of his claims. Accordingly, I am granting the motions for summary judgment filed by defendants. The motion to strike Grant's declaration will be granted, but the city defendants' request to prohibit Grant's trial testimony and McCoshen's motion for sanctions will be denied as moot in light of my ruling on the motions for summary judgment.

## UNDISPUTED FACTS

### A. The Parties

Plaintiff Damien Smith is African American and an inmate housed at the New Lisbon Correctional Institution in New Lisbon, Wisconsin. At all times relevant to this lawsuit, plaintiff was on parole, which is also known as "extended supervision."

Defendant City of Madison is a municipal corporation organized and existing under the statutes and constitution of the State of Wisconsin. Defendant Noble Wray is the former chief of police of the City of Madison Police Department, where defendant Paige Valenta is an assistant chief, defendant Cory Nelson is a captain and defendant Samantha Kellogg is a detective. Kellogg, Nelson and Valenta were the original detectives assigned to the Special Investigations Unit. Nelson worked for the unit from 2011 to 2013, Kellogg from July 2011 to January 20, 2018 and Valenta from June 2011 to October 11, 2012.

Defendant Colleen McCoshen is a probation and parole agent employed by the Wisconsin Department of Corrections and was plaintiff's probation and parole officer at all

times relevant to this case. She monitors and supervises offenders on community supervision, including individuals who are out of jail or prison on probation, extended supervision or parole. As part of her routine duties, McCoshen conducts home visits at her clients' residences. Occasionally, McCoshen takes law enforcement with her on home visits, especially in situations that could be dangerous.

## B. Creation of Focused Deterrence Program

In 2010, the Madison Police Department decided to explore deterrence strategies used by law enforcement agencies around the country, particularly those focused on repeat violent offenders. Defendant Wray was impressed with focused deterrence programs in other jurisdictions and believed that a similar program would benefit the Madison community. Police departments using a "focused deterrence" approach identify individuals responsible for creating a disproportionate amount of crime and absorbing law enforcement and community resources. They then seek to focus on these individuals, seeking swift and aggressive punishment through the criminal justice system if the individuals reoffend. The approach is proactive and relies on collaboration between the police and community resource providers.

In 2010, the Madison Police Department began the process of creating a Special Investigations Unit, comprising three detectives and the "lieutenant of investigative support," to operate a deterrence program. The unit became fully operational in July 2011. One of the unit's first tasks was to identify prolific violent offenders in the community who

would be targeted for increased investigation and enforcement and provided resources and support not otherwise available to them. Unit detectives, including Kellogg, Nelson and Valenta, used the following steps to identify candidates for the program:

1. The Department of Corrections provided the unit with a list of the most violent offenders released into the community over the past 12 months. (This list was not provided when the first group of candidates, including plaintiff, were selected.)

2. The police department's Information Management and Technology Unit separately retrieved data on the most prolific violent offenders in the department's "New World" computer system. Results of the query were sorted and put in descending order from "most offenses" to "least offenses." The following offenses were given greater emphasis: homicide, arson, assault, battery, domestic abuse, kidnapping, physical abuse of a child, sexual assaults, stalking, robbery and weapon offenses.

3. The unit analyzed the two lists, identified a top tier of candidates and provided those names to Criminal Intelligence Section officers, who conducted criminal history checks and gathered other intelligence on the candidates.

4. The Special Investigations Unit and the Criminal Intelligence Section disseminated the names of the candidates to the Madison Police Department and other law enforcement agencies for additional intelligence and information sharing. The unit also consulted with prosecutors and the Department of Corrections about individuals on the list.

5. The unit then reviewed and evaluated the candidates based on several behavioral factors, including the severity and immediacy of the threat to public safety posed by the individual; the individual's overall impact on the community; the number, frequency and recency of offenses; the amount of police resources that have been dedicated to the individual; reason to believe the individual is actively offending; and the individual's overall criminal history.

6. The unit provided a target list to Madison Police Department's crime analysts for assistance in identifying criminal trends and patterns to aid investigation.

7. The unit detectives provided its detectives with a case file and an investigative strategies checklist and then developed a response plan for the targeted individuals.

Although the steps have changed somewhat over the years, most of them were in place during the time period in which plaintiff was a potential candidate.

It is particularly relevant to the deterrence goal of the program whether an individual is actively engaging in criminal activity. The unit considers charged offenses for all candidates because even if an individual is not ultimately convicted, a charged offense indicates that there was adequate probable cause to charge the person with a crime. Charged offenses may not result in convictions for many reasons. For example, it is extremely difficult to prosecute some offenses, particularly domestic violence offenses, because witnesses may be intimidated by the offender and may refuse to testify. An individual with a high number of charged offenses for domestic violence-related incidents is seen as a threat to the community and to victims, even if the individual has not been convicted of a high number of crimes.

After the Special Investigations Unit identifies potential candidates using the seven-step process identified above, those candidates are subject to a separate and independent selection process for participation in a "notification call-in" or meeting. A notification selection committee makes the final decision as to which 10 to 15 repeat violent offenders will be called in for the notification meeting. Committee members include representatives from the Department of Corrections, the United States Attorney's Office, the Dane County District Attorney's Office, the Wisconsin Department of Corrections Pretrial Services Office,

Community Against Violence, the Madison Police Department and the Bureau of Alcohol, Tobacco, Firearms and Explosives. At the committee meeting held in advance of each scheduled notification, the Special Investigations Unit presents a list of potential notification candidates to the committee using a numbering system. Although the unit provides the committee an overview of each candidate's criminal history (including convictions and charges, dates of offenses and recent criminal activity), the candidates' names and race are not revealed to the committee to avoid bias. The committee considers the offenders' overall criminal history and whether the candidates and community would benefit from notification. Individuals not selected for notification remain eligible for future notification selection.

The selected candidates' supervising agents inform the candidates of the notification meeting date, time and location in a letter mandating their attendance. At the notification meetings, members of the Special Investigations Unit explain the purpose of the unit and inform the offenders that they will be monitored more than they had been in the past and will face a swift and aggressive response if they continue their violent behavior. The purpose of the notification meeting is to clearly and directly communicate to the identified individuals that they will be treated differently so long as they continue committing violent criminal offenses. In particular, they will be subject to increased scrutiny by law enforcement and, if they commit additional criminal offenses, the unit will advocate for maximum penalties. (Regardless of participation in the focused deterrence program, the Madison Police Department can increase law enforcement scrutiny and advocate for maximum penalties for all offenders.)

The notification call-in also provides offenders resources and information they can use to become positive and productive members of the community, such as help with building job skills, education, housing, transportation, substance abuse treatment, mental health treatment, domestic abuse avoidance, legal resources and driver's licenses or other governmental documents. Family members and significant others of the offenders are encouraged to attend the notification because social influence can be an effective element of deterrence and support.

The Special Investigations Unit shares the identities of the offenders who attend a notification with other police department units and law enforcement agencies for the purposes of officer safety, intelligence sharing and additional monitoring, but the names of notified offenders are not publicly released. The unit also assists the Department of Corrections with continued monitoring of notified offenders. In the event that a notified offender is arrested on new charges, the unit may communicate directly with the district attorney's office or the United States Attorney's office in order to expedite prosecution. (The Madison Police Department can request expedited prosecution regardless whether an individual is a notified offender in the program.)

The first notification occurred on November 8, 2011. As of August 2018, the unit has held 12 notifications and has notified a total of 132 individuals. Of those 132 offenders, 112 are African-American, 15 are Caucasian and five are Hispanic. In addition to the notification meetings, the Special Investigations Unit uses traditional policing methods to monitor and investigate offenders who have been notified under the focused deterrence

program, such as home visits, surveillance, employer checks, partnerships with other law enforcement agencies, confidential informants and, when appropriate and authorized, telephone tracking, search warrants, DNA sample collection, fingerprint samples, interviews and asset seizure. (With proper authorization, the Madison Police Department could take any of these actions regardless of an individual's membership in the focused deterrence program.)

B. Plaintiff's Criminal History

The Special Investigations Unit determined that plaintiff had 18 criminal charges and 24 charged offenses, seven felony convictions (substantial battery–intend bodily harm, bail jumping and possession with intent to deliver cocaine) and five misdemeanor convictions (battery, resisting or obstructing an officer, criminal damage to property and disorderly conduct). The substantial battery conviction and associated bail jumping conviction involved violence—plaintiff punched a stranger in the back of the head on State Street in Madison—for which plaintiff was sentenced to one year in prison (in 2012) and two years extended supervision (from March 21, 2011 to March 2013). Plaintiff's other battery convictions also involved him punching two strangers in the back of the head as they arrived home to their apartments. He was sentenced to five years' probation supervision for those crimes and two associated counts of bail jumping. Plaintiff's disorderly conduct and criminal property damage convictions involved an incident in which plaintiff confronted and attempted to batter a man in the parking lot of a gym. Plaintiff pleaded guilty to those

charges and was sentenced to one year in prison and two years extended supervision.

Plaintiff also had eight police contacts between July 3, 2007 to March 26, 2009 and was a suspect in incidents in 2011. Specifically, plaintiff was a suspect in a shooting that occurred on September 24, 2011 in the parking lot at New Towne Pub in Madison, where dozens of shots were fired in the parking lot. (In a similar incident on the day before, three people were shot outside of a bar on the south side of Madison, and the police suspected the two shootings may have been connected.) Approximately an hour and a half after the shooting on September 24, plaintiff received treatment under an alias at a hospital in Oconomowoc for a gunshot wound to his arm. Milwaukee authorities at the hospital spoke with plaintiff, who told them that he was shot in Milwaukee and had driven himself to the hospital. However, a surveillance video showed that someone else had driven plaintiff to the hospital. When the Madison Police Department interviewed plaintiff about his gunshot wound several days later, he initially told officers that he fell on a screwdriver and injured his arm. He later admitted that he had lied and said that he was shot on Theresa Terrace in Madison, but he was unable to provide police any details of the alleged shooting. (At his deposition in this case, plaintiff refused to discuss how he was shot.)

Defendant McCoshen was assigned as plaintiff's agent from approximately March 21, 2011 (the day prior to his release to extended supervision and probation) until March 8, 2013. On or about September 29, 2011, McCoshen learned from Madison Police Officer Amy Schwartz that plaintiff was a suspect in two recent shootings and had been stopped in Fitchburg on August 21, 2011 with a gun in his car. (The parties dispute when McCoshen

learned this information. McCoshen says that Schwartz told her about the August incident during their conversation, but plaintiff avers that he informed McCoshen of all his police contact when it occurred. In any event, the dispute is not material.) Although McCoshen discussed the situation with her supervisor and initiated revocation proceedings, on November 7, 2011, the two of them agreed that even though the violations were serious, there was insufficient evidence to revoke plaintiff's probation because Madison police were not able to charge plaintiff with the shooting.

C. Plaintiff's Selection for Focused Deterrence Program and Notification Call-In

Before the first notification meeting on November 8, 2011, defendants Kellogg, Nelson and Valenta compiled data on 157 individuals but eliminated anyone who was incarcerated or not living or working in Madison. The detectives also made judgments about the candidates' criminal histories based on how recently the candidate had committed criminal conduct and whether the candidate was actively offending. The detectives considered recent criminal activity and active offending around the time of notification to be important because they believed that the program would encourage the cessation of such activity. Plaintiff was among those Kellogg, Nelson and Valenta identified as a potential candidate for the November 8, 2011 notification. Defendant McCoshen had no knowledge as to what data the committee relied on when selecting the participants, and she had no authority to remove any participant from the program.

The Special Investigations Unit determined that plaintiff had multiple convictions,

including three for acts of violence against strangers, and that he was actively engaging in criminal conduct and violating the terms of his probation and parole. The unit also believed that plaintiff's numerous bail jumping convictions demonstrated his failure to adhere to the rules of his supervision.

The Special Investigations Unit presented the notification selection committee the criminal histories of 18 numbered candidates, including plaintiff, at a meeting on October 18, 2011. None of the defendants served as members of the selection committee. Defendant McCoshen was not part of the selection process for determining who was chosen for the program and was not present for any meetings with the committee members who selected the program participants. (Although plaintiff says that the Department of Corrections created a list of potential program participants, he has not adduced any evidence that McCoshen was involved in this process in any way. Moreover, plaintiff does not dispute defendants' contention that the Department of Corrections had one representative on the program's selection committee, who for one meeting was Mark Mellinthin and for another meeting was Lance Wiersma.)

The Special Investigations Unit created plaintiff's criminal history by reviewing police records, probation and parole records and soliciting input from area law enforcement officers and agents. Plaintiff's name, race and gang affiliation were never disclosed to the committee. (Although plaintiff generally avers in his affidavit that "[a] dozen friends and family members told me that they were familiar with many [Community Against Violence] members from the selection committee [who] knew [about my] gang affiliations," dkt. #63

at ¶ 38, these statements are hearsay and insufficient to show that any members of plaintiff's selection committee knew about his particular gang affiliations. In addition, although several of plaintiff's witnesses aver that gang affiliations were emphasized at the notification and were important to the selection process, none of them stated that they had any personal knowledge about what information was made available to the specific members of plaintiff's selection committee.)

Plaintiff's candidate summary identified his criminal charges, charged offenses, felony and misdemeanor convictions and police contacts and stated the following with respect to his more recent suspected conduct:

- "On 9/24/11, dozens of shots were fired in a parking lot adjacent to a bar on the west side of Madison. This shooting occurred only a day after three people were shot outside a bar on the south side of Madison. Candidate #19 is suspected of having involvement in one or both of the shootings. On 9/28/11, Candidate #19 was contacted, and he had at least one gunshot wound." (The candidates presented to the committee were not numbered sequentially from one to 18.)

- "On 8/21/11, Candidate #19 was stopped by police driving a vehicle that he has been associated with for years. During the stop, the officer searched the vehicle and located in the glove box a loaded 9 mm pistol. A backseat passenger in the vehicle claimed ownership of the gun."

- "From April through June 2011, Candidate #19 was identified by police officers as being present with another subject on approximately 3 occasions when that other subject sold quantities of crack cocaine and heroin to an undercover police officer."

The selection committee chose plaintiff and nine other candidates for the notification call-in.

In October 2011, McCoshen's supervisor notified her in an email that the Madison Police Department's Special Investigations Unit had implemented a focused deterrence

program and that she and other probation and parole agents were required to hand deliver a form letter to selected offenders under their supervision. The email did not state that the program focused only on African American offenders. McCoshen hand delivered a notification letter from the Department of Corrections to plaintiff at the Dane County jail on October 21, 2011 and explained the program to him. The notification letter stated that plaintiff was selected for the program and was required to attend a notification meeting on November 8, 2011.

D. <u>Notification Meeting</u>

At the November 8, 2011 notification, plaintiff and the other selected individuals were given a presentation by law enforcement representatives and community resource providers. Defendants Wray, Nelson, Kellogg, Valenta and McCoshen attended, but McCoshen was only a spectator. Nelson, Kellogg and Valenta did not search plaintiff or any of the other notified offenders at the meeting. (Although plaintiff's witnesses aver that "SIU" searched all of the offenders in front of news cameras, none of them identify whether Nelson, Kellogg and Valenta were personally involved in performing the searches.)

The law enforcement panel, which included defendant Wray, explained to the offenders that if they chose to reoffend, justice would be swift and harsh and each agency would advocate for the longest period of incarceration possible. Representatives from several agencies spoke about services that they could offer the offenders. For example, Community Against Violence is led by the United Way of Dane County and Madison Urban Ministries

and is made up of community members who are willing to assist offenders in living crime-free, productive lives in the community. During the notification, a representative from Madison Urban Ministries talked to the offenders about the impact of their actions on the community. More than a dozen members of Community Against Violence offered plaintiff and the other offenders an array of services to which they would be granted priority access. The offenders were each introduced to a representative from Madison Urban Ministries who had been designated as that offender's caseworker to help match a service provider with any need that offender might have.

At the end of the presentations, the notified individuals were shown a video and given the opportunity to meet personally with the resource providers. All that was required of plaintiff with respect to his inclusion in the focused deterrence program was his one-time attendance at the notification; it was up to him to decide whether he wanted to avail himself of the program's services.

### E. Plaintiff's Post-Notification Conduct

At or around the time of the November 8, 2011 notification, McCoshen was assigned to supervise program participants and began supervising other offenders chosen for the program. In that role, she conducted home visits of the program participants, usually accompanied by Special Investigations Unit detectives. The rules of community supervision signed by plaintiff on November 7, 2011 and provided to him on January 19, 2012, stated that "You shall make yourself available for searches or tests ordered by your agent including

but not limited to urinalysis, breathalyzer, DNA, collection and blood samples or search of residence or any property under your control." The Department of Corrections's standard rules of community service state that offenders shall "[m]ake [themselves] available for searches including but not limited to residence, property, computer, cell phone or other electronic device under [their] control," and "for tests and [are to ]comply with ordered tests by [their] agent, including but not limited to urinalysis, breathalyzer, DNA collection and blood samples."

After the notification, McCoshen conducted home visits at plaintiff's residence on November 9 and 23, 2011, and January 19, 2012. Although McCoshen may have walked through plaintiff's home during the home visits, she never searched his home, personal property or electronics. In addition, McCoshen met weekly with plaintiff in her office during this time period. The unit detectives were not present during these office visits.

Special Investigations Unit records show that the detectives visited plaintiff's home on the following occasions: (1) Valenta and Nelson attempted to visit plaintiff's residence on December 7, 2011, and Nelson and Kellogg attempted contact on December 16, 2011, but plaintiff was not at home on either occasion; (2) Nelson and Valenta assisted McCoshen with a home visit for "EMP monitoring" on January 19, 2012; (3) either Kellogg or Nelson assisted McCoshen with the installation of a GPS monitor at plaintiff's residence on February 20, 2012 and March 7 and 16, 2012; and (4) Valenta assisted McCoshen in hooking plaintiff up to his GPS monitor on April 4, 2012. (The parties dispute whether the detectives searched plaintiff or his residence and electronics during these visits. Defendants

deny performing these searches.  Plaintiff and a few of his witnesses generally state that "SIU" searched his person, property and residence on a routine or bi-weekly basis, but none of them provide any details about who in the Special Investigations Unit conducted these searches, the dates on which the searches occurred or what happened during the searches.).

None of the individual defendants have made any public statements about plaintiff. (Although plaintiff and a few of his witnesses aver that plaintiff "was 'used' as the 'golden egg' at every notification," they do not identify who made the alleged comments about plaintiff or what they said.)

Beginning on December 16, 2011, plaintiff had several police contacts, most of which involved drug sales to undercover officers and his violation of the terms of his parole by missing curfew.  On May 15, 2012, plaintiff was taken to the Dane County jail on a probation hold, and McCoshen told unit detectives that she would be recommending revocation of plaintiff's probation and parole.  On August 22, 2012, plaintiff was indicted by a grand jury in for multiple counts of knowingly and intentionally conspiring to distribute heroin and crack cocaine.

In late November 2012, plaintiff was sentenced to 12 years in prison and 13 years of extended supervision.  McCoshen and the unit detectives attended the state sentencing hearing, but none of them has any authority over who is or is not allowed in the state courthouse.

OPINION

A. Motion to Exclude Testimony of Romale Grant

As an initial matter, the city defendants ask that I strike the declaration of Romale Grant, who also is being monitored by the focused deterrence program, and not allow him to testify on plaintiff's behalf at trial. Dkt. #64. Defendants contend that they have been unable to secure any testimony from Grant about his declaration, and the discovery period has now closed. Under Fed. R. Civ. P. 30(d)(2), the "court may impose an appropriate sanction—including the reasonable expenses and attorney's fees incurred by any party—on a person who impedes, delays, or frustrates the fair examination of the deponent." See also Donelson v. Hardy, 931 F.3d 565, 569 (7th Cir. 2019) (sanctions under Rule 30(d)(2) and courts' inherent powers "are justified by bad-faith conduct").

On April 25, 2019, defense counsel served Grant a deposition subpoena requiring his deposition testimony on May 8, 2019. Defendants subsequently learned that Grant was in jail for a probation violation and would not be able to attend, so they sought and obtained leave to depose Grant in jail, in accordance with Federal Rule of Civil Procedure 30(a)(2)(B). Dkt. #77, 78. Defendants served a second subpoena requiring Grant's deposition testimony on May 31, 2019—the last day of the discovery period under the court's scheduling order. Although Grant appeared for his deposition, he refused to answer any questions because he wanted an attorney. Grant did not notify anyone of his concerns prior to the date of the deposition and, to defendants' knowledge, has made no effort to obtain representation or otherwise make himself available for a deposition. Plaintiff did not respond to defendants'

motion.

I agree with defendants that Grant has exhibited bad faith by refusing to respond to any questions at his properly noticed deposition, failing to make arrangements for legal counsel and not making himself available for a deposition. In light of these facts and plaintiff's lack of objection, I will grant defendants' request not to consider Grant's declaration. Defendants' request that I preclude Grant from testifying at trial will be denied as moot in light of my ruling with respect to defendants' motions for summary judgment.

### B. Motion for Sanctions

In support of his response to defendants' motions for summary judgment, plaintiff submitted unsigned declarations from third-party witnesses James Bloodshaw, Nina Salisbury and Patricia Dillon, bearing only the signature "/s____," followed by the typewritten name of the declarant. Dkt. ##65-67. Defendant McCoshen contends that through the subsequent depositions of these witnesses, she learned that Dillon never signed her declaration and that Salisbury could not remember who told her that she could not attend plaintiff's state sentencing hearing, dkt. #80 at 41, even though Salisbury's declaration states that "McCoshen and SIU told me I could not attend Smith's sentencing hearing on 11/29/11, because he was a SIU member." Dkt. #66 at ¶14. Dillon testified at her deposition that plaintiff wrote the declaration and her daughter, Salisbury, asked her to sign it. Dkt. #81 at 17. Although Dillon gave Salisbury permission to sign the declaration on her behalf, she admitted that portions of the document regarding the purpose

of the focused deterrence program and her relationship with members of the Special Investigations Unit were inaccurate. Dkt. #81 at 17-19, 30-34. McCoshen asks that I dismiss plaintiff's claims against her as a sanction for plaintiff's use of declarations that "undermine the integrity of the judicial process."

Because plaintiff has not responded to the motion for sanctions, I can presume that he does not dispute defendant's contentions with respect to the declarations. Although I agree that Dillon's declaration is unreliable and should not be considered as admissible evidence for purposes of summary judgment, the discrepancies between Salisbury's declaration and her later equivocal testimony about the sentencing hearing relate to Salisbury's credibility and the weight to be given her testimony. In any event, it is unnecessary to determine whether dismissal of plaintiff's claims against McCoshen is an appropriate sanction because I have determined that McCoshen is entitled to summary judgment with respect to all of plaintiff's claims against her.

## C. Equal Protection Claims

Plaintiff contends that all of the defendants violated his rights under the equal protection clause by placing him in the focused deterrence program because he is an African American. As an initial matter, an individual defendant cannot be held liable under § 1983 unless that defendant is determined to be personally responsible for the constitutional violation by causing or participating in it directly. Burks v. Raemisch, 555 F.3d 592, 595-96 (7th Cir. 2009); Hildebrandt v. Illinois Department of Natural Resources, 347 F.3d 1014,

1039 (7th Cir. 2003). Although the individual city defendants do not deny that they helped create the focused deterrence program and identified plaintiff as a potential candidate for the program, plaintiff has failed to present sufficient evidence that McCoshen had any role in this process or the authority to remove him from the program. The undisputed facts show that McCoshen was plaintiff's probation and parole agent and was ordered to deliver to plaintiff the Department of Corrections form letter, informing him that he had been placed in the program and was required to attend the notification. Contrary to plaintiff's assertion, a reasonable jury would not conclude from these facts that McCoshen was anything more than a messenger. Accordingly, McCoshen is entitled to summary judgment with respect to plaintiff's equal protection claim.

To prove his equal protection claim against the remaining individual city defendants, plaintiff "must show that the program 'had a discriminatory effect" and that the defendants 'were motivated by a discriminatory purpose.'" Alston v. City of Madison, 853 F.3d 901, 906 (7th Cir. 2017) (quoting Chavez v. Illinois State Police, 251 F.3d 612, 635-36 (7th Cir. 2001)). See also Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 265 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."). To prove discriminatory effect, plaintiff must show that he was a member of a protected class and that he was treated differently from a similarly situated member of an unprotected class. Alston, 853 F.3d at 906. He may show different treatment either through statistical analysis or by identifying a particular similarly situated member of the unprotected class who was treated differently

from him.  Id.  Discriminatory purpose requires a showing that defendants selected "a particular course of action at least in part because of . . . its adverse effects upon an identifiable group," and "means more than simple knowledge that a particular outcome is the likely consequence of an action."  Id. at 907 (citing Chavez, 251 F.3d at 645).

A local governing body like the City of Madison "may be liable for monetary damages under § 1983 if the unconstitutional act complained of is caused by:  (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority.  Thomas v. Cook County Sheriff's Department, 604 F.3d 293, 303 (7th Cir. 2009) (citing Monell v. Department of Social Services, 436 U.S. 658, 690-91 (1978); Valentino v. Village of South Chicago Heights, 575 F.3d 664, 674 (7th Cir. 2009). See also Freeman v. Metro. Water Reclamation Dist. of Greater Chicago, 927 F.3d 961, 966 (7th Cir. 2019) (policy, custom, or act by final decisionmaker must have caused plaintiff to suffer constitutional injury).  In this case, the only City of Madison policy, custom or practice that plaintiff identifies is the selection process for the focused deterrence program. (Although a reasonable jury can infer from the undisputed facts that defendant Wray had final policy-making authority with respect to the program in his position as the chief of police, plaintiff has not made any specific allegations against Wray.)

In Alston, both this court and the Court of Appeals for the Seventh Circuit had an opportunity to address an almost identical equal protection challenge to Madison's focused deterrence program.  As in Alston, plaintiff relies primarily on statistics to prove both

discriminatory effect and discriminatory purpose in this case.  In particular, he notes that of the 132 individuals placed in the focused deterrence program as of August 2018, 112 of them are black.  As I recognized in <u>Alston</u>, when compared to the small number of African Americans in the city of Madison (less than 8 percent of the total population in 2016, dkt. #62-4), that is a striking figure.  <u>Alston v. City of Madison</u>, No. 13-CV-635-BBC, 2015 WL 9095069, at *4 (W.D. Wis. Dec. 16, 2015).  Plaintiff also points to data from the Federal Bureau of Investigation regarding the incidence of crime by race and the violent crime rate for the State of Wisconsin in an attempt to show that Caucasians commit the majority of violent crimes.  Dkt. #62-11.  Although these statistics show a disparate *impact*, they are only one small part of proving discriminatory *effect* or *intent*.  <u>Id.</u>

Statistics are relevant to discriminatory *effect* only if they address whether plaintiff was treated differently from a similarly situated member of the unprotected class.  <u>Alston</u>, 853 F.3d at 907 (citing <u>Chavez</u>, 251 F.3d at 638).  Here, as in <u>Alston</u>, statistics regarding statewide crime rates and the racial composition of the focused deterrence program "do not address whether black, repeat violent offenders were treated differently from white, repeat violent offenders and thus are not evidence of discriminatory effect."  <u>Id.</u>

Similarly, "disparate impact alone is almost always insufficient to prove discriminatory purpose."  <u>Id.</u> (citing <u>Washington v. Davis</u>, 426 U.S. 229, 239 (1976)).  Without more, a court's acceptance of a disparate-impact argument "would render suspect each difference in treatment among the grant classes, however lacking in racial motivation and however otherwise rational the treatment might be."  <u>Washington</u>, 426 U.S. at 241

(quoting <u>Jefferson v. Hackney</u>, 406 U.S. 535, 548 (1972)). A plaintiff relying on statistical evidence must still adduce specific evidence showing that the defendants discriminated against *him* in particular. <u>Id.</u>; <u>Baylie v. Federal Reserve Bank of Chicago</u>, 476 F.3d 522, 524 (7th Cir. 2007) ("Statistical analysis is relevant . . . [but] data showing a small increase in the probability of discrimination cannot by itself get a plaintiff over the more-likely-than-not threshold; it must be coupled with other evidence, which does most of the work."); <u>Nichols v. Southern Illinois University-Edwardsville</u>, 510 F.3d 772, 782 (7th Cir. 2007) ("[A] plaintiff may use pattern evidence of disparate treatment even if that evidence is not rigorously statistical, although, standing alone, it is insufficient evidence to withstand summary judgment."). For example, plaintiff has failed to adduce evidence about the number of black, repeat violent offenders who qualified for the program but were not chosen or about the number of white, repeat violent offenders chosen compared to the number of white, repeat violent offenders who could have been chosen. <u>Alston</u>, 853 F.3d at 908 ("Absent more specific statistics, we cannot say that mere disparate impact is sufficient to prove discriminatory purpose.").

In addition, plaintiff's statistics would not be probative of discrimination in this case unless plaintiff showed that defendants or a city policy or practice was responsible for unfair arrests and incarcerations. Defendants cannot be held liable simply for relying on plaintiff's or another individual's criminal history or arrest record when making decisions regarding the focused deterrence program, even if defendants knew that statistics showed a disparate impact. <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 677 (2009) ("[E]ach Government official . . . is

only liable for his or her own misconduct. . . [P]urpose rather than knowledge is required to impose . . . liability . . . for unconstitutional discrimination."); id. at 676-77 ("[P]urposeful discrimination requires more than intent as volition or intent as awareness of consequences. It instead involves a decisionmaker's undertaking a course of action because of, not merely in spite of, the action's adverse effects upon an identifiable group.") (internal quotations, citations and alterations omitted).  Because plaintiff does not tie any of his arrest and crime statistics to the decisions made by defendants, that evidence is not helpful.  Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc., __ U.S. __, 135 S. Ct. 2507, 2523 (2015) ("[R]acial imbalance does not, without more, establish a prima facie case of disparate impact and thus protects defendants from being liable for racial disparities they did not create.") (internal quotation omitted).

Plaintiff makes a few additional arguments in support his claim, but they are not helpful.  First, plaintiff contends that even though the unit detectives did not inform the selection committee of the race of the candidates, gang affiliation was used as a proxy for race.  However, plaintiff has failed to present any admissible evidence regarding what defendants or the members of the selection committee knew about each candidate's gang affiliation.  Apart from his own general accusations, plaintiff has failed to present any evidence showing that offenders associated with allegedly black gangs were chosen as potential candidates for the program while offenders identified with allegedly white gangs were not.  In fact, a review of the candidate summaries that the Special Investigations Unit detectives provided to the selection committee for plaintiff's notification shows that no gang

affiliation was identified for plaintiff or some of the other potential candidates.

Second, plaintiff argues that defendants inaccurately labeled him as one of the most violent offenders in Madison and mistakenly assumed that he was more likely to reoffend than individuals convicted of less violent crimes. The undisputed evidence shows that plaintiff has been convicted of several offenses, including some violent crimes, and has numerous additional arrests and police contacts. Plaintiff makes a fair point that even despite this criminal history, it seems unlikely that plaintiff would qualify as one of "the most violent offenders" in the city. He also cites some additional statistics from the Department of Corrections, which defendants do not dispute for purposes of summary judgment, stating African Americans and Caucasians have similar recidivism rates, dkt. #62-5, and that offenders incarcerated for property offenses demonstrated the highest recidivism rates and those incarcerated for violent offenses demonstrated the lowest recidivism rate. Dkt. #62-6. However, even a small number of violent convictions and general statistics regarding recidivism rates are not enough to allow a reasonable jury to find that the focused deterrence program had a discriminatory effect or that defendants placed plaintiff in the program because of his race. Alston, 2015 WL 9095069, at *4. In addition, the program was targeting violent offenses, not just recidivism generally.

Although it may seem unfair for defendants to consider charged or suspected offenses (such as the shootings) for which plaintiff was never convicted, that decision is not *discriminatory* unless defendants were treating plaintiff differently from other, similarly situated individuals. City of Cleburne, Texas v. Cleburne Living Center, 473 U.S. 432, 439

(1985) (equal protection clause requires that "all persons similarly situated should be treated alike"). Plaintiff has not made that showing. In fact, it is undisputed that the Special Investigations Unit considered charged offenses as well as convictions in deciding upon all potential candidates for notification, because even if an individual is not ultimately convicted, a charged offense indicates the existence of adequate probable cause to charge the person with a crime and charged offenses may not result in convictions for many reasons.

Neither side compares plaintiff's criminal history with the criminal histories of the other individuals included in the program or individuals excluded from the program. However, defendants have submitted the candidate summary for the 18 individuals presented to the selection committee. Dkt. #45-1. A review of that document shows that many of the candidates had at least as many felony convictions as plaintiff for similar types of crimes. Although some of the individuals were convicted of arguably more potentially-violent felonies involving a firearm, a reasonable jury would not conclude from that evidence alone that defendants treated plaintiff differently from the other candidates. In any event, it is plaintiff's burden to present evidence to prove his claim, and he has failed to do so. Wade v. Collier, 783 F.3d 1081, 1088-89 (7th Cir. 2015) ("[I]t is [the plaintiff] and not the defendants who bears the burden of proof and to survive summary judgment, [the plaintiff] must identify an individual who was similarly situated but treated differently, without a rational reason."); Bass v. Joliet Public School District No. 86, 746 F.3d 835, 841 (7th Cir. 2014) ("It is [the plaintiff], the party with the burden of proof, who must present some evidence that would allow a rational jury to infer intentional discrimination by the

[defendant]."). Without more than his conclusory allegations that he was not one of the most violent offenders in the city, plaintiff cannot show that he was treated differently from any of the other candidates presented to the selection committee.

In sum, plaintiff has failed to present sufficient evidence from which a reasonable jury could conclude that the city's focused deterrence program had a discriminatory effect or that the individual defendants acted with a discriminatory purpose. Accordingly, the city defendants are entitled to summary judgment as to plaintiff's equal protection claim.

## D. Due Process

The due process clause requires the state to provide notice and an opportunity to be heard before depriving an individual of certain types of liberty or property. For example, public officials may violate an individual's right to due process if they injure his reputation and alter his legal status without giving him an opportunity to clear his name. Mann v. Vogel, 707 F.3d 872, 878 (7th Cir. 2013). In this case, plaintiff says that the individual defendants and his selection for the focused deterrence program harmed his reputation by labeling him one of the city's "most violent offenders" and changed his legal status by subjecting him to warrantless searches without his consent, conducting an excessive number of home visits and denying his family and friends access to his state sentencing hearing in 2012.

"A plaintiff may prove a deprivation of a protected liberty interest by showing damage to his 'good name, reputation, honor, or integrity.'" Hannemann v. S. Door County School

District, 673 F.3d 746, 753 (7th Cir. 2012) (quoting Wisconsin v. Constantineau, 400 U.S. 433, 437 (1971)). But not every defamatory statement by a public official constitutes an unconstitutional deprivation of liberty, Paul v. Davis, 424 U.S. 693, 702 (1976); the action must also alter a previously recognized legal status or right. Hinkle v. White, 793 F.3d 764, 767-68 (7th Cir. 2015) (explaining "stigma-plus" injury).

As defendants point out, plaintiff has not presented any admissible evidence from which a reasonable jury could conclude that any of the individual defendants publicly labeled him one of the most violent offenders in the city. The general averments by plaintiff and his third party witnesses that plaintiff was used an the "epitome" of the "worst violent offender" at notifications are insufficient to show that any of the named defendants made a defamatory statement about plaintiff. However, in Alston, the court of appeals recognized that because the entire purpose of the City of Madison's focused deterrence program "was to monitor repeat violent offenders, anyone selected for the program carried that brand," and "[w]ithout question, being classified as a 'repeat violent offender' harms one's reputation." Alston, 853 F.3d at 909.

Even though a reasonable jury may be able to conclude that plaintiff was "stigmatized" for purposes of the first prong of the constitutional inquiry, he has not shown that being selected for the program affected his previously recognized legal status or any right he possessed. The undisputed evidence shows that the only additional requirement placed on plaintiff was his mandatory attendance at the notification meeting. Id. (finding same). As a probationer and parolee with reduced liberty interests, being forced to attend one

notification meeting does not constitute "a sufficiently large incremental reduction in freedom to be classified as a deprivation of liberty." Id. at 909-10 (quoting Domka v. Portage County, Wisconsin, 523 F.3d 776, 781 (7th Cir. 2008)).

Plaintiff and his third-party witnesses generally contend that "SIU regularly searched his person, property and residence" and "harassed" him "in public." However, none of the evidence that plaintiff cites in support of this contention includes any details regarding these searches or harassment or shows that any of the named defendants were personally involved in the searches or harassment. In any event, it is undisputed that plaintiff was on probation and parole during the entire period in question and would have been subject to searches of his person, residence and personal property, including electronics. Although plaintiff was subject to regular home visits as part of the focused deterrence program, which most likely included searches, he does not identify any new restrictions that defendants placed on his conduct as a result of his placement in the program or any new punishments to which he would not have been subject before his placement in the program. Even if I assume that the program required McCoshen and the unit detectives to monitor plaintiff's conduct more closely, and that McCoshen was more likely to seek revocation of his probation and parole as a result of the program, it is undisputed that these are discretionary decisions that McCoshen and the unit detectives could have made even without the existence of the program. Accordingly, plaintiff has not identified any new restrictions on his liberty imposed on him as a result of his placement in the focused deterrence program. Alston, 853 F.3d at 910 (increased surveillance and penalties city wanted enforced against program

members were penalties already authorized by law).

Finally, plaintiff alleges that McCoshen, Nelson, Kellogg or Valenta prevented his friends and family from attending his state sentencing hearing in November 2012. With some exceptions, the Sixth Amendment guarantees criminal defendants a right to a public trial. Presley v. Georgia, 558 U.S. 209, 212 (2010); Waller v. Georgia, 467 U.S. 39, 45 (1984) ("[T]he right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information."); Benabe v. United States, 68 F. Supp. 3d 858, 867-68 (N.D. Ill. 2014) (district court's exclusion of defendant's family members from courtroom until after voir dire because lack of space did not deprive defendant of Sixth Amendment right to public trial). However, plaintiff has failed to present sufficient admissible evidence from which a reasonable jury could conclude that any of the defendants prevented his friends and family from attending his state sentencing hearing. The declarations of Patricia Dillon and James Bloodshaw include only inadmissible hearsay statements about "SIU" not allowing them or someone they knew to attend the hearing. Dkt. #67 at ¶11; dkt. #64 at ¶19. Although Nina Salisbury's unsigned declaration states that "Agent McCoshen and SIU told me I could not attend Smith's sentencing hearing on 11/29/11, because he was a SIU member," dkt. #66 at ¶14, Salisbury does not provide any details or context about the statements allegedly made by McCoshen or the unidentified SIU member. Moreover, it is undisputed that none of the defendants had the authority to limit public access to the courtroom. Without more, plaintiff cannot show that McCoshen or any

of the other defendants altered his legal status or significantly reduced his freedom in any way.

Accordingly, I conclude that defendants are entitled to summary judgment as to plaintiff's due process claims against them.


E. Fourth Amendment Claim

Plaintiff contends that defendants Nelson, Valenta and Kellogg had no legal basis for searching him at the November 8, 2011 notification meeting and during visits to his home every other week from November 2011 to May 2012. He also alleges that defendant Nelson illegally searched all of his electronics during those home visits.

The Fourth Amendment protects the right of individuals to be free from "unreasonable searches and seizures." U.S. Const. amend. IV. In general, a search or seizure is reasonable where "there is probable cause to believe that a criminal offense has been or is being committed." Devenpeck v. Alford, 543 U.S. 146, 152 (2004). However, it is undisputed that at the time that the alleged searches occurred, plaintiff was on probation and parole and expressly subject to searches of his person, residence and property. Probationers and parolees have reduced Fourth Amendment rights. Probationers may be searched on the basis of "reasonable suspicion" that they violated the terms of their supervision. United States v. Knights, 534 U.S. 112, 121 (2001); Knox v. Smith, 342 F.3d 651, 657 (7th Cir. 2003). However, the United States Supreme court has held that "parolees have fewer expectations of privacy than probationers, because parole is more akin

to imprisonment than probation is to imprisonment" and "[t]he essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence." Samson v. California, 547 U.S. 843, 850 (2006) (quoting Morrissey v. Brewer, 408 U.S. 471, 477 (1972)). Therefore, the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee. Id. at 856. Accordingly, defendants Nelson, Valenta and Kellogg are entitled to summary judgment with respect to his Fourth Amendment claims against them.

## ORDER

IT IS ORDERED that:

1. The motions for summary judgment filed by defendants Noble Wray, Cory Nelson, Samantha Kellogg, Paige Valenta and the City of Madison, dkt. #43, and defendant Colleen McCoshen, dkt. #51, are GRANTED.

2. The motion to strike filed by defendants Wray, Nelson, Kellogg, Valenta and the City of Madison, dkt. #85, is GRANTED with respect to Grant's declaration and DENIED as moot with respect to Grant's trial testimony.

3. Defendant McCoshen's motion for sanctions, dkt. #82, is DENIED as moot.

4. The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered this 23d day of September, 2019.

BY THE COURT:

/s/
_____
BARBARA B. CRABB
District Judge